Matthew L. Sharp
matt@mattsharplaw.com
Nevada Bar #4746
MATTHEW L. SHARP, LTD.
432 Ridge Street
Reno, NV 89501
Phone: (775) 324-1500
Fax: (775) 284-0675

Thomas J. McKenna
tjmckenna@gme-law.com
Gregory M. Egleston
gegleston@gme-law.com
*Pro Hac Vice Admissions Pending*
GAINEY McKENNA & EGLESTON
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LOREN GIEBRECHT, Derivatively On Behalf OF L&L ENERGY, INC., | Case No. |
| Plaintiff, | |
| vs. | **VERIFIED COMPLAINT FOR BREACH OF FIDUCIARY DUTY WITH JURY DEMAND** |
| DICKSON V. LEE, SYD S. PENG, JINGCAI YANG, JAMES SCHAEFFER, and JOSEPH BORICH, | |
| Defendants, | |
| and | |
| L&L ENERGY, INC., | |
| Nominal Defendant. | |

This is a verified shareholder derivative action brought on behalf of Nominal Defendant L&L Energy, Inc. ("L&L" or the "Company"). The relevant period is from September 11, 2012 through and including September 18, 2013 (the "Relevant Period"). This action is brought

1    against certain of L&L's current officers and directors for breaches of fiduciary duties and unjust

2    enrichment.

3    **JURISDICTION AND VENUE**

4       1.      This Court has jurisdiction over the subject matter of this action pursuant to 28

5    U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the

6    amount in controversy exceeds $75,000.00 exclusive of interest and costs.

7       2.      This action is not a collusive one designed to confer jurisdiction upon a court of

8    the United States that it would not otherwise have.

9       3.      Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because a

10   substantial portion of transactions and wrongs complained of herein occurred in this District.

11   The Company is incorporated in Nevada.

12   **PARTIES**

13      4.      Plaintiff Loren Giesbrecht is a current shareholder of L&L and has continuously

14   held L&L stock during the Relevant Period and through the present.  Plaintiff is a citizen of

15   New York.

16      5.      Nominal Defendant L&L formerly known as L&L International Holdings, is a

17   coal-mining company founded in 1995.  L&L purports, through its subsidiaries, to engage in

18   coal mining, clean coal washing, coal coking, and coal wholesaling businesses in China.  The

19   Company's coal products include washed coal and metallurgical coke used primarily for steel

20   manufacturing.  The Company is incorporated in Nevada.

21      6.      Defendant Dickson V. Lee ("Lee") is, and at all relevant times was, Chairman,

22   CEO and a director of L&L.  Dickson Lee is a resident of Washington.

23      7.      Defendant Syd S. Peng ("Peng") is, and at all relevant times was, a coal advisor

24   and a director of L&L.  Defendant Peng is a resident of West Virginia.  Defendant Peng is a

25   member of the Audit and Compensation committees, and Chair of the Nominating Committee.

26      8.      Defendant Jingcai Yang ("Yang") is, and at all relevant times was, a Director of

27   L&L.  Upon information and belief, Defendant Yang is a resident of Washington.  Defendant

28

1  Yang is a member of Audit and Nominating committees, and Chair of the Compensation

2  Committee.

3      9.      Defendant Clayton Fong ("Fong") is, and at all relevant times was, a Director and

4  Vice President of L&L.  Upon information and belief, Defendant Fong is a resident of

5  Washington.

6      10.     Defendant Mohan Datwani ("Datwani") is, and at all relevant times was, a

7  Director of L&L.  Upon information and belief, Defendant Datwani is a resident of Hong Kong.

8  Defendant Datwani is a member of the Compensation and Nominating committees and Chair of

9  the Audit Committee.

10     11.     Defendants Lee, Peng, Yang, Fong and Datwani are collectively referred to

11  herein as the "Individual Defendants."

12                          **DEFENDANTS' DUTIES**

13     12.     Defendants, because of their positions of control and authority as officers and

14  directors of the Company, were able to and did, directly and indirectly, control or fail to control

15  the wrongful acts complained of herein.  Because of their executive positions with the

16  Company, Defendants had access to adverse non-public information about the financial

17  condition and operations of the Company, including, without limitation.

18     13.     To discharge their duties, Defendants were required to exercise reasonable and

19  prudent supervision over the management, policies, practices, and controls of the financial,

20  business, and corporate affairs of the Company.  By virtue of such duties, Defendants were

21  required, among other things, to:

22          (a)     Manage, conduct, supervise and direct the business affairs of the

23  Company in accordance with the laws of the United States, the states and countries in which it

24  conducted business, and the Company's charter and bylaws; and

25          (b)     Implement and oversee in good faith, and with loyalty, adequate internal

26  controls sufficient to accurately report the Company's true financial condition in accordance

27  with applicable federal and state laws, rules and regulations.

28

3

14.     Defendants further owed to L&L the duty of loyalty, including the duty of candor, requiring full and accurate disclosure of the Company's true financial condition, including the adequacy of its internal controls.

15.     In addition, as part of the duty of loyalty owed to the Company, Defendants were required to preserve the assets of the corporation by, inter alia, enforcing the rights of the Company to recover damages caused to the corporation by the wrongful acts of others.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD

16.     On September 10, 2012, after the market closed, L&L issued a press release announcing its financial results for the first quarter ended July 31, 2012.  For the quarter, the Company reported net income of $8.5 million, or $0.17 diluted earnings per share ("EPS") and net revenues of $45.3 million, as compared to net income of $3.1 million, or $0.08 diluted EPS and net revenues of $36.1 million for the same period of the prior year.

17.     On September 10, 2012, the Company filed a quarterly report on Form 10-Q for the first quarter ended July 31, 2012 with the SEC, which was signed by Defendant Lee, and reiterated the Company's previously announced financial results and financial position. In addition, pursuant to Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-Q contained a signed certification by Defendant Lee, stating that the financial information contained in the 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

18.     The Form 10-Q stated the following in relevant part:

> On March 15, 2011, the Company entered into an Acquisition Agreement to acquire 60% equity of the DaPing Coal Mine ("DaPing"), with an effective date of March 15, 2011, for a purchase price of 112,080,000 RMB (equivalent to approximately US $17,064,815).  An initial installment of 10,000,000 RMB (equivalent to US $1,592,686) had been paid as of July 31, 2012. The remaining balance of 102,080,000 RMB is to be paid based on the achievement of several requirements by the Company and DaPing, which were met during the year-ended April 30, 2012. After meeting five requirements, 30% of the total purchase price, RMB 33,624,000 (equivalent to US $5,355,249) should be paid. The remaining balance of 68,456,000 RMB (equivalent to US $10,902,894) is payable after meeting another 3 requirements subsequent.  As of July 31, 2012, the remaining balance of approximately US $15 million is payable since the first 5

requirements haven't been fully met.  The Company paid the $1,676,307 of the total amount of purchase price in the period ended July 31, 2012.

*   *   *

Sale of Ping Yi Mine
With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the Ping Yi Mine.  On April 30, 2012, the Company entered into an Equity Sale and Purchase Agreement with Mr. Zhang, the previous owner of Ping Yi Mine, whereby the company sold its 100% equity ownership interest in Ping Yi Mine for RMB 196,000,000, approximately $31,000,000.  The payment was agreed to take the form of receipt with payment in two parts, (1) through receipt of coal extracted from Ping Yi Mine subsequent to the disposal, including priority receipt of future coal from Ping Yi mine at a 5% discounted price compared to the market price until 70% of the payment is received; (2) through receipt of the use of Ping Yi Mine's washing facilities subsequent to disposal, including usage fees charged at a 3%-5% discounted price compared to the market price until 30% of the payment is received.  The terms of the agreement state that full payment must be received within five years, and that 70% of total receipts must occur by the end of year three.  As of July 31, 2012, the Company received total payment of 869,374, which $825,155 as prepayment of raw coal and 44,219 as coal washing facilities service.

19.     On December 10, 2012, the Company issued a press release announcing its financial results for the second quarter ended October 31, 2012.  For the quarter, the Company reported net income of $10.8 million, or $0.21 diluted EPS and net revenues of $45.5 million, as compared to net income of $5.3 million, or $0.11 diluted EPS and net revenues of $29.5 million for the same period of the prior year.

20.     On December 10, 2012, the Company filed a quarterly report on Form 10-Q for the second quarter ended October 31, 2012 with the SEC, which was signed by Defendant Lee, and represented the Company's quarterly financial results and financial position.  In addition, pursuant to SOX, the Form 10-Q contained a signed certification by Defendant Lee, stating that the financial information contained in the 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

21.     The Form 10-Q stated the following in relevant part:

On March 15, 2011, the Company entered into an Acquisition Agreement to acquire 60% equity of the DaPing Coal Mine ("DaPing"), with an effective date of March 15, 2011, for a

5

purchase price of 112,080,000 RMB (equivalent to approximately US $17,064,815). The Company had effective control of Da Ping since right after the signing of the Acquisition Agreement on March 15, 2011. An initial installment of 10,000,000 RMB (equivalent to US $1,592,686) had been paid as of July 31, 2012. The remaining balance of 102,080,000 RMB is to be paid based on the achievement of several requirements by the Company and DaPing. After meeting five requirements, 30% of the total purchase price, RMB 33,624,000 (equivalent to US $5,355,249) should be paid. The remaining balance of 68,456,000 RMB (equivalent to US $10,902,894) is payable after meeting another 3 requirements subsequent. As of October 31, 2012, the remaining balance of approximately US $11.7 million is payable since the first 5 requirements haven't been fully met. The Company paid the $6,018,817 of the total amount of purchase price in the period ended October 31, 2012.

\*      \*      \*

Sale of Ping Yi Mine
With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the Ping Yi Mine.

On April 30, 2012, the Company entered into an Equity Sale and Purchase Agreement with Mr. Zhang, the previous owner of Ping Yi Mine, whereby the Company sold its 100% equity ownership interest in Ping Yi Mine for RMB 196,000,000, approximately $31,000,000. The payment was agreed to take the form of receipt with payment in two parts, (1) through receipt of coal extracted from Ping Yi Mine subsequent to the disposal, including priority receipt of future coal from Ping Yi mine at a 5% discounted price compared to the market price until 70% of the payment is received; (2) through receipt of the use of Ping Yi Mine's washing facilities subsequent to disposal, including usage fees charged at a 3%-5% discounted price compared to the market price until 30% of the payment is received. The terms of the agreement state that full payment must be received within five years, and that 70% of total receipts must occur by the end of year three. As of October 31, 2012, the Company received total payment of $3,575,262 which $3,387,663 as prepayment of raw coal and $187,599 as coal washing facilities service.

The Company recorded $408,020 as income from discontinued operations for the year-ended April 30, 2012. Additionally, the Company recorded $3,183,786 of costs to dispose related to the provision of discounting the estimated receipt of the payment over the payment term (refer to Note 5 and 11). Subsequently, the Company has written back $318,378 as income related to the provision for the six months ended October 31, 2012.

On October 26, 2012, the Company decided to proceed with the Sales and Purchase Agreement with Union Energy for Luozhou and Lashu mines located in the Guizhou Province, China. This transaction was then completed on November 18, 2012.

1                  Under the Agreement, the Company acquired 95% of both
Luozhou and Lashu mines from Union Energy for $37.1 million.

2                  This payment was satisfied by a cash outlay of approximate $1.7
million and transfers of the Company's interests in Zonelin

3                  Coking Plant (98%) and the DaPing Mine (60%).

4        22.     On March 11, 2013, L&L issued a press release announcing its financial results

5  for the third quarter ended January 31, 2013.  For the quarter, the Company reported net income

6  of $18.8 million, or $0.42 diluted EPS and net revenues of $59.9 million, as compared to net

7  income of $4.9 million, or $0.12 diluted EPS and net revenues of $19.4 million for the same

8  period of the prior year.

9        23.     On March 11, 2013, the Company filed a quarterly report on Form 10-Q for the

10  third quarter ended January 31, 2013 with the SEC, which was signed by Defendant Lee, and

11  reiterated the Company's previously announced quarterly financial results and financial position.

12  In addition, pursuant to SOX, the Form 10-Q contained a signed certification by Defendant Lee,

13  stating that the financial information contained in the 10-Q was accurate, and disclosed any

14  material changes to the Company's internal control over financial reporting.

15        24.     The Form 10-Q stated the following in relevant part:

16                  On March 15, 2011, the Company entered into an Acquisition
Agreement to acquire 60% equity of the DaPing Coal Mine

17                  ("DaPing"), with an effective date of March 15, 2011, for a
purchase price of 112,080,000 RMB (equivalent to approximately

18                  US $17,064,815). The Company had effective control of DaPing
since right after the signing of the Acquisition Agreement on

19                  March 15, 2011.

20                  Sale of Ping Yi Mine
With consideration of several factors including continuing

21                  development strategies, the Company made the determination to
dispose of the Ping Yi Mine.  On April 30, 2012, the Company

22                  entered into an Equity Sale and Purchase Agreement with Mr.
Zhang, the previous owner of Ping Yi Mine, whereby the

23                  company sold its 100% equity ownership interest in Ping Yi Mine
for RMB 196,000,000, approximately $31,000,000.  The payment

24                  was agreed to take the form of receipt with payment in two parts,
(l) through receipt of coal extracted from Ping Yi Mine

25                  subsequent to the disposal, including priority receipt of future coal
from Ping Yi mine at a 5% discounted price compared to the

26                  market price until 70% of the payment is received; (2) through
receipt of the use of Ping Yi Mine's washing facilities subsequent

27                  to disposal, including usage fees charged at a 3%-5% discounted
price compared to the market price until 30% of the payment is

28                  received.  The terms of the agreement state that full payment must

be received within five years, and that 70% of total receipts must occur by the end of year three.  As of January 31, 2013, the Company received total payment of $5,619,088 which $5,324,718 as prepayment of raw coal and $294,370 as coal washing facilities service.

The Company recorded $408,020 as income from discontinued operations for the year-ended April 30, 2012. Additionally, the Company recorded $3,183,786 of costs to dispose related to the provision of discounting the estimated receipt of the payment over the payment term (refer to Note 5 and 11).  Subsequently, the Company has written back $477,568 as income related to the provision for the nine months ended January 31, 2013.

Sale of DaPing Coal Mine
With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the DaPing Mine. On November 18, 2012, the Company decided to purchase two coal mines, which are LouZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant.  The fair value of the 60% equity interest in DaPing is reasonably stated by the amount of approximately $23 million, including $0.5 million on assets write-up per fair value measurement.

Sale of ZoneLin Coking Plant
With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the ZoneLin Coking Plant.  On November 18, 2012, the Company decided to purchase two coal mines, which are LouZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant.  The fair value of the 100% equity interest in ZoneLin is reasonably stated by the amount of RMB 77,786,000 (approximately $12.4 million, including $2.7 million on assets write-up per fair value measurement).

\*   \*   \*

In December 2012, China's National Policy changed to allows sole proprietorship of mines to be changed to special limited company.  The Company made these changes on March 1, 2013.  The name of DaPuAn Coal Mine ("DaPuAn") has been changed to Shizong HengTai Coal Mining Co., Ltd. DaPuAn Mine ("HengTaiDaPuAn"). Similarly, SuTsong Coal Mine ("SuTsong") has been changed to limited partnership structure.  Under the agreements, the Company still has 80% of the equity in both of HengTai DaPuAn and SuTsong.  The transactions do not impact the existing ownership of both mines by the Company.

25.    On July 30, 2013, L&L issued a press release announcing its financial results for the fiscal year ended April 30, 2013.   For the year, the Company reported net income of $49.2

1  million, or $0.98 diluted EPS and net revenues of $199 million, as compared to net income of

2  $19.2 million, or $0.42 diluted EPS and net revenues of $112.9 million for the same period of

3  the prior year.

4      26.    On July 30, 2013, the Company filed its annual report on Form 10-K for the fiscal

5  year ended April 30, 2013 with the SEC, which was signed by, among others, Defendant Lee,

6  and reiterated the Company's previously announced financial results and financial position for

7  the fiscal year ended April 30, 2013.  In addition, pursuant to SOX, the Form 10-K contained a

8  signed certification by Defendant Lee, stating that the financial information contained in the

9  10-K was accurate, and that they disclosed any material changes to the Company's internal

10  control over financial reporting.

11      27.    The Form 10-K represented the following in relevant part:

12       We own two washing facilities with an aggregate annual
   coal-washing capacity of approximately 480,000 tons.  The
13       facility at Hong Xing washes coal mainly for third parties (i.e.,
   non-affiliates to the Company.)  The facility at the DaPuAn Coal
14       mine only washes coal from the DaPuAn mine.

15       *   *   *

16       Since DaPuAn only washes its own coal from its own mine, we
   only listed the raw coal under the Mining Segment.  We have
17       considered this is part of the total service provided within
   DaPuAn before the coal was sold to customer.  There was no
18       washing reported separately.

19       *   *   *

20       In April 2012, we sold our interest in Ping Yi mine and coal
   washing plant back to the original owners.  DaPuAn only washes
21       coal from its own mine.  We have considered this as part of the
   total service provided within DaPuAn before the coal was sold to
22       customer.   Therefore, there was no washing for DaPuAn reported
   separately.
23
         *   *   *
24
         Sale of Ping Yi Mine
25       With consideration of several factors including continuing
   development strategies, the Company made the determination to
26       dispose of the Ping Yi Mine.  On April 30, 2012, the Company
   entered into an Equity Sale and Purchase Agreement with Mr.
27       Zhang, the previous owner of Ping Yi Mine, whereby the
   company sold its 100% equity ownership interest in Ping Yi Mine
28       for RMB 196,000,000, approximately $31,000,000.  The payment

1    was agreed to take the form of receipt with no payment in two
     parts, (1) through receipt of coal extracted from Ping Yi Mine
2    subsequent to the disposal, including priority receipt of future coal
     from Ping Yi mine at a 5% discounted price compared to the
3    market price until 70% of the payment is received; (2) through
     receipt of the use of Ping Yi Mine's washing facilities subsequent
4    to disposal, including usage fees charged at a 3%-5% discounted
     price compared to the market price until 30% of the payment is
5    received.  The terms of the agreement state that full payment must
     be received within five years, and that 70% of total receipts must
6    occur by the end of year three.  The Company has no continuing
     involvement in the disposed business.
7
     The Company recorded $408,020 as income from discontinued
8    operations for the year ended April 30, 2013. Additionally, the
     company recorded $3,183,786 of costs to dispose related to the
9    provision of discounting the estimated receipt of the payment over
     the payment term. Net of the valuation allowance, the estimated
10   receipt was recognized as current disposal receivable and long
     term disposal receivable of $7,094,403 and $20,921,811
11   respectively.

12   Sale of DaPing Coal Mine
     With consideration of several factors including continuing
13   development strategies, the Company made the determination to
     dispose of the DaPing Mine. On November 18, 2012, the
14   Company decided to purchase two coal mines, which are
     LuoZhou and LaShu mines by making a swap of the 60% equity
15   interest in DaPing mine and 98% equity interest in ZoneLin
     Coking Plant.  The fair value of the 60% equity interest in DaPing
16   is reasonably stated by the amount of approximately $23 million,
     including $0.5 million on assets write-up per fair value
17   measurement.  The Company has no continuing involvement in
     the disposed business.
18
     Sale of ZoneLin Coking Plant
19   With consideration of several factors including continuing
     development strategies, the Company made the determination to
20   dispose of the Zone Lin Coking Plant.  On November 18, 2012,
     the Company decided to purchase two coal mines, which are
21   LouZhou and LaShu mines by making a swap of the 60% equity
     interest in DaPing mine and 98% equity interest in ZoneLin
22   Coking Plant.  The fair value of the 100% equity interest in
     ZoneLin is reasonably stated by the amount of RMB 77,786,000
23   (approximately $12.4 million, including $2.7 million on assets
     write-up per fair value measurement). The Company has no
24   continuing involvement in the disposed business.

25        28.    On July 31, 2013, the Company held an analyst conference call to discuss the

26   financial results for the fiscal year ended April 30, 2013.  During the analyst conference call,

27   Defendant Fong had the following Q&A exchange with an analyst:

28

<Q>: Do you at least, [indiscernible] (15: 59). Can you at least comment on the trend from Ql to Q4 in the coal washing? Can you give us any color on the trend?

<Fong>: Coal washing. The trend, I can tell you -- the trend has been up. Hang on a second, let me grab a ...

<Q>: Yeah. The coal washing at Hong Xing is not just to clarify?

<Fong>: Right. The coal washing in Hong Xing has been relatively steady year over-year, 2012 to 2013. We washed about overall 77,000 tons out of the -- in that segment and that compares to about 62,000 tons, 63,000 tons -- excuse me, let me get the actual tons right. We went from about 400,000 tons to 470,000 tons year over- year. That area has been a little more steady. I don't have the breakdown between the two, but I know because I would expect and I'll make sure of this, but I believe that's all the Hong Xing facility because it doesn't -- those numbers exclude the Ping Yi mine, which was a split facility and they also -- and Hong Xing would be the only facility that we would count separately. The DaPuAn mine washes only its own coal, so it tends to just get lumped in with its coal sales, not a separate breakout on washing. So, the bottom-line is, it is stronger than it was last year. It's mostly due to the fact that production in the area has been better and so the availability of coal has been better.

<Q>: Okay, all right, and I appreciate that, and just one final question here, Clayton, if I could, [indiscernible] referring back to the Hong Xing, would you consider that even in Q4 -- excuse me, in Q 1, in this current quarter that the – they are trending up at the Hong Xing Coal Washing Facility. Is that safe to assume from what you -- from your answer -- from your last answer?

<Fong>: Overall, I don't have the quarter-over-quarter number in front of me, but I do know that we've been trending up modestly on the coal washing side.

29.     On August 19, 2013, the Company issued a press release entitled, "L&L Provides Strategic Update." Specifically, the press release stated the following in relevant part concerning the Hong Xing Washing Facility:

The Hong Xing Washing facility is L&L's smaller coal washing plant located in Shezone County, Yunnan Province ("Hong Xing"). Over the past few months L&L management decided to wind down operations due to increased needs to capital expenditures. Management has decided Hong Xing will not be accretive to L&L in the long run and has stopped Hong Xing's washing operations. Hong Xing facility is to be sold or disposed to an interested buyer as soon as possible.

1    30.    On September 9, 2013, the Company issued a press release announcing its

2    financial results for the first quarter ended July 31, 2013.  For the quarter, the Company reported

3    net income of $13.4 million, or $0.27 diluted EPS and net revenues of $51.2 million, as

4    compared to net income of $8.5 million, or $0.17 diluted EPS and net revenues of $39.4 million

5    for the same period of the prior year.

6    31.    On September 9, 2013, the Company filed a quarterly report on Form 10-Q for

7    the first quarter ended July 31, 2013 with the SEC, which was signed by Defendant Lee, which

8    reiterated the Company's previously announced quarterly financial results and financial position.

9    In addition, pursuant to SOX, the Form 10-Q contained a signed certification by Defendant Lee,

10   stating that the financial information contained in the 10-Q was accurate, and that it disclosed

11   any material changes to the Company's internal control over financial reporting.

12   32.    The Form 10-Q stated the following in relevant part:

13       Sale of Ping Yi Mine
         With consideration of several factors including continuing
14       development strategies, the Company made the determination to
         dispose of the Ping Yi Mine.   On April 30, 2012, the Company
15       entered into an Equity Sale and Purchase Agreement with Mr.
         Zhang, the previous owner of Ping Yi Mine, whereby the
16       company sold its 100% equity ownership interest in Ping Yi Mine
         for RMB $196,000,000, approximately US $31,000,000. The
17       payment was agreed to take the form of receipt with payment in
         two parts, (1) through receipt of coal extracted from Ping Yi Mine
18       subsequent to the disposal, including priority receipt of future coal
         from Ping Yi mine at a 5% discounted price compared to the
19       market price until 70% of the payment is received; (2) through
         receipt of the use of Ping Yi Mine's washing facilities subsequent
20       to disposal, including usage fees charged at a 3%-5% discounted
         price compared to the market price until 30% of the payment is
21       received.  The terms of the agreement state that full payment must
         be received within five years, and that 70% of total receipts must
22       occur by the end of year three.  As of July 31, 2013, the Company
         received total payment of $2,077,063 as coal washing facilities
23       service.

24       The Company recorded $408,020 as income from discontinued
         operations for the year-ended April 30, 2012. Additionally, the
25       Company recorded $3,183,786 of costs to dispose related to the
         provision of discounting the estimated receipt of the payment over
26       the payment term (refer to Note 5 and 11).

27       Sale of DaPing Coal Mine
         With consideration of several factors including continuing
28       development strategies, the Company made the determination to

dispose of the DaPing Mine.  On November 18, 2012, the Company decided to purchase two coal mines, which are LuoZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in Zone Lin Coking Plant.  The fair value of the 60% equity interest in DaPing is reasonably stated by the amount of approximately $23 million, including $0.5 million on assets write-up per fair value measurement.  The Company has no continuing involvement in the disposed business.

Sale of ZoneLin Coking Plant
With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the ZoneLin Coking Plant.  On November 18, 2012, the Company decided to purchase two coal mines, which are LouZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant.  The fair value of the 100% equity interest in ZoneLin is reasonably stated by the amount of RMB 77,786,000 (approximately $ 12.4 million, including $2.7 million on assets write-up per fair value measurement).  The Company has no continuing involvement in the disposed business.

33.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them that: (I) the Company improperly accounted substantial revenue from operations that were already shut down; (ii) the Company claimed acquisitions and divestitures of various properties through swap transactions that never occurred through the exchange of assets it never owned in the first place; (iii) the Company lacked adequate internal and financial controls; and (iv) that, as a result of the foregoing, the Company's financial results were materially false and misleading at all relevant times.

**THE TRUTH EMERGES**

34.     On September 19, 2013, GeoInvesting published an article on Seeking Alpha accusing the Company "of defrauding investors by booking substantial revenue from operations that have been idled for quite some time."  Moreover, GeoInvesting stated that "LLEN's string of acquisitions and divestitures of various properties over the last few years amounts to a bait and switch shell game where it claimed to come into possession of assets through swap transactions that never occurred through the exchange of assets it never owned in the first place."  GeoInvesting stated the following:

13

1

**Revenue Misrepresentation**

1.  LLEN's Hong Xing Coal Washing Factory, accounting for 39% of fiscal 2013 revenues, has been shut down since 2012, according to interviews conducted in July 2013 by GeoInvesting investigators with the only remaining staff on site as well as local residents.

2.  Hong Xing did not file or pay any taxes to the Shizong County Local Tax Bureau since June 2012, and paid minimal taxes to the Bureau in the first half of 2012, according to our research.

3.  On July 31, 2013, the LLEN management team falsely claimed in its fiscal 2013 earnings conference call ". . .  we've been trending up modestly on the coal washing side."  However, twenty days later, on August 19, 2013, LLEN announced in a press release: "L&L to Dispose Hong Xing Washing Facility."  GeoInvesting believes that LLEN's abrupt decision to dispose of its purportedly profitable and growing coal washing operation was triggered by LLEN's discovery of our ongoing investigation.

4.  Similar to Hong Xing, LLEN's purportedly revenue producing ZoneLin Coking Plant was shuttered and demolished a few months prior to LLEN's claimed $12.4M sale/exchange of ZoneLin Coking Plant to Union Energy, according to interviews with local residents, workers, and a government official.

5.  The government mandated decision to shut down the ZoneLin Coking Plant was first issued on June 6, 2012.  On September 10, 2012 the demolition was scheduled.

**Acquisition/Ownership Misrepresentation**

6.  LLEN does not own the Hong Xing Coal Washing Factory according to officially chopped (sealed) SAIC records.

7.  Officially chopped SAIC filings show that neither Union Energy nor LLEN own the DaPing mine and Zone Lin Coking Plant.

8.  The demolition of the Zone Lin Coking Plant prior to its alleged swap to Union Energy casts doubt on LLEN's acquisition of the LuoZhou and LaShu mines.  LLEN claims that it acquired the LuoZhou and LaShu mines from Union Energy through a November 19, 2012 "asset swap" transaction, whereby LLEN exchanged its 98% interest in the ZoneLin Coking Plant and its 60% interest in the DaPing mine for Union Energy's 95% interests in the LuoZhou and LaShu mines.  We find it highly implausible that Union Energy would want to acquire the ZoneLin Coking Plant, valued by LLEN at $12.4 million, when the ZoneLin Coking Plant was in the process of being torn down.

9. The Chinese government assigned the right to consolidate the DaPing mine to another company (not Union Energy).  According

1    to local residents, Union Energy never acquired LLEN's 60%
     interest in the DaPing mine.

2

3    10. In addition to the above findings, we have referenced multiple
     pieces of evidence that have led us to conclude that the asset swap
     deal never occurred and that LLEN did not acquire, nor does it

4    today own the LuoZhou and LaShu mines.  Our evidence
     includes:

5

6    11. Current SAIC filings show that Union Energy owns the
     LuoZhou and LaShu mines.  These SAIC filings have the official
     chop (seal) of the Guizhou SAIC.

7

8    12. Interviews of Union Energy management who all repeatedly
     assert that, while they are familiar with LLEN, Union Energy, not
     LLEN, is the owner of the LuoZhou and LaShu mines.  Interviews

9    with multiple LuoZhou and LaShu mine employees further
     confirm Union Energy's ownership and complete control over the

10   day to day operations and coal sales.

11   13. Articles in local PRC newspapers and official government
     websites clearly show that Union Energy, not LLEN, acquired and

12   owns the LaShu and LuoZhou mines.

13   14. Signage apparently recently erected at both mines bears Union
     Energy's name, not LLEN's.

14

15   15. Union Energy's participation in the Guizhou provincial mine
     consolidation process is ongoing and well documented.  Union
     Energy was assigned to acquire the LuoZhou and LaShu mines in

16   March 2013 and just finalized the acquisition of mining rights for
     both mines in August 2013.

17

18   16. The nominee who claimed to hold LLEN's equity ownership
     in the DaPuAn mine and SuTsong mine is an individual who
     appears not to exist.

19

20   17. LLEN made a misrepresentative statement regarding the legal
     status of the DaPuAn mine and SuTsong mine.  Our findings
     greatly help explain LLEN's complete lack of free cash flow and

21   inability to service its accounts payable resulting in a $4,983,075
     highly dilutive debt for equity exchange arrangement after

22   creditors sued LLEN in the Superior Court of the State of
     California for the County of Los Angeles Central District. Most

23   importantly, $800,000 of the dilutive issuance resulted from the
     exchange of obligations owed to Dickson Lee, LLEN's chairman.

24   Effectively, Dickson Lee indirectly sued his own company and
     disclosed this fact only after reaching the settlement that occurred

25   on August 14, 2013 and was buried in the proxy statement issued
     on August 16, 2013.

26

27   ///

28   ///

15

## DERIVATIVE AND DEMAND FUTILITY
## ALLEGATIONS FOR THE BOARD OF L&L

35.     Plaintiff brings this action derivatively in the right and for the benefit of L&L to redress injuries suffered and to be suffered by L&L as a result of the breaches of fiduciary duty by Defendants.

36.     Plaintiff will adequately and fairly represent the interests of L&L and its shareholders in enforcing and prosecuting its rights.

37.     As a result of the facts set forth herein, Plaintiff has not made a demand on the L&L Board of Directors to institute this action against Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

38.     At the time of the filing of this derivative action, Defendants who are currently the members of the L&L's Board are Defendants Lee, Peng, Yang, Fong and Datwani.

## THE MEMBERS OF THE BOARD OF DIRECTORS LACK INDEPENDENCE
## DEFENDANT LEE LACKS INDEPENDENCE

39.     Defendant Lee serves as the Company's CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  For instance, Defendant Lee received compensation of $300,000 in 2013.  Because of Lee's employment with the Company he is not considered an independent director.  Further, the Company does not have a lead independent director.  Moreover, Defendant Lee received during fiscal year 2013, $50,000 in stock option awards, and $80,000 option/warrant awards.

## DEFENDANT FONG LACKS INDEPENDENCE

40.     Defendant Fong serves as the Company's Vice President, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  For instance Fong received compensation of $162,496 in 2013.  Because of Fong's employment with the Company he is not considered an independent director.  Further, Defendant Fong received during fiscal year 2013, $50,000 in stock option awards, and $80,000 option/warrant awards.

## LIKELIHOOD OF SUBSTANTIAL LIABILITY OF THE
## AUDIT COMMITTEE DEFENDANTS

41.     Defendants Peng, Yang and Datwani each serve on the Audit Committee of L&L's Board.  As such, they will take no action against one another or the other members of the Board or the other Defendants because each member of this Audit Committee breached important specific duties as Audit Committee members.  According to L&L's SEC filings and Audit Committee Charter the purpose of the Audit Committee is, among other things, to monitor and oversee the quality and integrity of the Company's accounting process and system of internal controls.

42.     Defendants Peng, Yang and Datwani ignored clear and obvious red flags and in doing so breached their fiduciary duties of due care, loyalty, and good faith.   Specifically, Defendants Peng, Yang and Datwani ignored clear and obvious red flags regarding (1) the Company improperly accounted substantial revenue from operations that were already shut down; (2) the Company claimed acquisitions and divestitures of various properties through swap transactions that never occurred through the exchange of assets it never owned in the first place; and (3) the Company lacked adequate internal and financial control.

43.     The Audit Committee members possesses and possessed essentially unfettered power to the Company's records and can request additional information or meet with management as it deems necessary to fulfill its responsibilities.

44.     As a result of the Audit Committee's failures, Defendants Peng, Yang and Datwani face a substantial likelihood of liability for breaches of fiduciary duties, making any demand upon them futile.

## ADDITIONAL LIKELIHOOD OF SUBSTANTIAL LIABILITY
## OF THE COMPENSATION COMMITTEE MEMBERS

45.     Defendants Peng, Yang and Datwani were at times relevant hereto members of the Company's Compensation Committee.   Pursuant to its Charter, the Compensation Committee is and was responsible for, among other things, reviewing and approving the compensation and incentive arrangements for the Company's CEO and Executive Chairman.

46.     The Compensation Committee permitted the continued compensation payments to senior executives, like Defendants Lee and Fong, based on misleading statements and grossly inflated financial results, and in the process, committed corporate waste.

Additional Likelihood of Substantial Liability of the Board of Directors

47.     The Board members of L&L approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise these wrongs from L&L shareholders or recklessly disregarded the wrongs complained herein, and are therefore not disinterested parties.  Each of the Defendants exhibited a systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to extreme recklessness and bad faith.

48.     In order to bring this suit, the Board members of L&L would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

49.     The acts complained of constitute violations of the fiduciary duties owed by L&L's officers and directors and these acts are incapable of ratification.

50.     L&L has been, and will continue to be subjected to lawsuits for the actions described herein, including securities fraud class action lawsuits, yet the Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for L&L any part of the damages the Company has suffered and will continue to suffer.

51.     The actions of the Directors and the relationships between and among Defendants as described above have impaired the Board's ability to validly exercise its business judgment and have rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

52.     Any suit by the directors of L&L to remedy these wrongs would likely expose the Defendants and L&L to further violations of securities laws which could result in additional civil actions being filed against one or more of the Board members.  In light of this, they are

1    conflicted in making any supposedly independent determination as to whether to sue

2    themselves.

3         53.    Indeed, L&L has already expended and will continue to expend significant sums

4    of money as a result of the illegal and improper actions described above.  Such expenditures will

5    include, but are not limited to:

6              (a)    Costs incurred to carry out internal investigations, including legal fees

7    paid to outside counsel and experts; and

8              (b)    Costs and legal fees for defending L&L and certain of the Defendants

9    against private securities class action litigation arising from illegal and improper conduct alleged

10   herein.

11        54.    Plaintiff has not made any demand on the shareholders of L&L to institute this

12   action since demand on the shareholders would be a futile endeavor for the following reasons:

13             (a)    L&L is a publicly held company with millions of shares outstanding, and

14   thousands of shareholders;

15             (b)    Making demand on such a number of shareholders would be impossible

16   for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the

17   shareholders; and

18             (c)    Making demand on all shareholders would force Plaintiff to incur huge

19   expenses, assuming all shareholders could be individually identified.

20                                **COUNT I**
                          **BREACH OF FIDUCIARY DUTY**

21

22        55.    Plaintiff incorporates by reference and realleges each and every allegation set

23   forth above, as though fully set forth herein.

24        56.    As alleged in detail herein, each of the Defendants had a duty to ensure that L&L

25   disseminated accurate, truthful and complete information to its shareholders.

26        57.    Defendants violated their fiduciary duties of care, loyalty, and good faith by

27   causing or allowing the Company to disseminate to L&L shareholders materially misleading and

28

1    inaccurate information through public statements and disclosures as detailed herein. These

2    actions could not have been a good faith exercise of prudent business judgment.

3        58.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary

4    duties, the Company has suffered significant damages, as alleged herein

## COUNT II
### BREACH OF FIDUCIARY DUTIES FOR FAILING TO
### PROPERLY OVERSEE AND MANAGE THE COMPANY

7        59.    Plaintiff incorporates by reference and realleges each and every allegation

8    contained above, as though fully set forth herein.

9        60.    Defendants owed and owe L&L fiduciary obligations.  By reason of their

10   fiduciary relationships, Defendants specifically owed and owe L&L the highest obligation of

11   good faith, fair dealing, loyalty and due care.

12       61.    Defendants, and each of them, violated and breached their fiduciary duties of

13   care, loyalty, reasonable inquiry, oversight, good faith and supervision.

14       62.    As a direct and proximate result of Defendants' failure to perform their fiduciary

15   obligations, L&L has sustained significant damages, not only monetarily, but also to its

16   corporate image and goodwill.

17       63.    As a result of the misconduct alleged herein, Defendants are liable to the

18   Company.

19       64.    Plaintiff, on behalf of L&L, has no adequate remedy at law.

## COUNT III
### ABUSE OF CONTROL

22       65.    Plaintiff incorporates by reference and realleges each and every allegation

23   contained above, as though fully set forth herein.

24       66.    Defendants' misconduct alleged herein constituted an abuse of their ability to

25   control and influence L&L, for which they are legally responsible.  In particular, Defendants

26   abused their positions of authority by causing or allowing L&L to misrepresent material facts

27   regarding its business.

28

67.     As a direct and proximate result of Defendants' abuse of control, L&L has sustained significant damages.

68.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

69.     Plaintiff, on behalf of L&L, has no adequate remedy at law.

**COUNT IV**
**GROSS MISMANAGEMENT**

70.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.     Defendants had a duty to L&L and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of L&L.

72.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of L&L in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of L&L's affairs and in the use and preservation of L&L's assets.

73.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused L&L to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to L&L, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged L&L.

**COUNT V**
**WASTE OF CORPORATE ASSETS**

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.   As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused L&L to incur (and L&L may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

76.   As a result of this waste of corporate assets, Defendants are liable to the Company.

77.   Plaintiff, on behalf of L&L, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

2.   Directing L&L to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.   Awarding to L&L restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

4.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and expenses; and

5.   Granting such other and further relief as the Court deems just and proper.

///

///

///

///

1

**JURY TRIAL DEMANDED**

2

Plaintiff hereby demands a trial by jury.

3

DATED this 20th day of December 2013.

4

MATTHEW L. SHARP, LTD.

5

6

_____/s/ Matthew L. Sharp_____

7

Matthew L. Sharp
432 Ridge Street
Reno, NV 89501

8

Phone: (775) 324-1500
Fax: (775) 284-0675

9

matt@mattsharplaw.com

10

Thomas J. McKenna
tjmckenna@gme-law.com

11

Gregory M. Egleston
gegleston@gme-law.com

12

GAINEY McKENNA & EGLESTON
440 Park Avenue South, 5th Floor

13

New York, NY 10016
Telephone: (212) 983-1300

14

Facsimile: (212) 983-0383
*Attorneys for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Loren Giesbrecht, declare that I have reviewed the Verified Complaint for Breach of Fiduciary Duty (the "Complaint") prepared on behalf of L&L Energy, Inc. ("L&L") and authorize its filing.   I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of L&L common stock at all relevant times.

12/18/2013
Date

Loren Giesbrecht